UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X   **Index No.:** 1:25-cv-1706

CRYSTAL MCKINNEY,

                     Plaintiff,                      **FIRST AMENDED COMPLAINT**

  - against -

HARVEY WEINSTEIN, MIRAMAX HOLDING       **PLAINTIFF DEMANDS**
CORP., THE WALT DISNEY COMPANY, DISNEY     **A TRIAL BY JURY**
ENTERPRISES, INC., and DOE CORP 1-10

                 Defendants.
------------------------------------------------------------------------X

Plaintiff CRYSTAL MCKINNEY ("Plaintiff"), by and through her attorneys, PHILLIPS & ASSOCIATES, PLLC, hereby alleges and avers of the Defendants Harvey Weinstein ("Defendant Weinstein"), Miramax Holding Corp. ("Miramax"), The Walt Disney Company, Disney Enterprises (collectively referred to as "Disney") and DOE CORP 1-10 alleges upon information and belief as to all other matters as follows.

## NATURE OF THE ACTION

Plaintiff brings suit against Defendants pursuant to the NYC Gender Motivated Violence Protection Act, N.Y.C. Admin. Code §§ 8-901 *et. seq*, to redress the substantial and lifetime injuries she has suffered as a result of being sexually assaulted by Harvey Weinstein.

## PROCEDURAL REQUIREMENTS

### THE N.Y.C. VICTIMS OF GENDER MOTIVATED VIOLENCE PROTECTION ACT

1.    The N.Y.C. Victims of Gender Motivated Violence Protection Act ("NYC Gender Motivated Violence Act") created a lookback window on March 01, 2023, which runs for

two years, for survivors of gender motivated violence, allowing them to sue their abusers regardless of when the abuse occurred. N.Y.C. Admin. Code § 10-1105(a).

2. The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

3. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

4. Defendant Weinstein coerced Plaintiff to engage in sexual contact and/or sexual intercourse in New York City, despite the fact that she was rendered incapable of consenting due to the use of physical force and/or intoxication.

5. The above-described conduct of Defendant Weinstein, including, but not limited to, Defendant's sexual assault of Plaintiff in New York City, constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by the NYC Gender Motivated Violence Act.

## PARTIES

### DEFENDANT WEINSTEIN

6. Defendant Weinstein is an Oscar and Tony winning producer.

7. Defendant Weinstein is currently incarcerated at Rikers Island jail in New York, New York.

8. Prior to his arrest, Defendant Weinstein was a citizen of the state of Connecticut.

9. In 1979, Defendant Weinstein founded Miramax, a film company which produced Pulp Fiction, Shakespeare in Love, and Good Will Hunting.

10. In 1993, Disney bought Miramax, and thus, Defendant Weinstein became a Disney employee. Disney paid Weinstein an annual salary of $1.5 million.

## **DEFENDANT MIRAMAX**

11. Miramax is a film company founded by Defendant Weinstein.

12. Miramax is a domestic limited liability company licensed to do business in New York.

13. Miramax has received 68 Oscar Awards, including four Best Picture winners.

14. From 1990 to 2010, Disney owned Miramax.

## **DDEFENDANTS DISNEY**

15. Defendants The Walt Disney Company and Disney Enterprises, Inc., (collectively referred to as "Disney") are foreign business corporations licensed to do business in New York and are headquartered at 500 S. Buena Vista St., Burbank, CA 91521.

16. Disney is a multinational media conglomerate that operates television and film studios, theme parks, merchandising operations, and streaming services.

17. In 1993, Disney purchased Miramax for $60 million.

18. As part of the deal, Disney employed Defendant Weinstein and Bob Weinstein, paid the brothers about $1.5 million a year,[1] did not charge Miramax for operating capital,[2] and agreed to fund 15-20 Miramax films each year.[3]

19. From 1993 to 2010, Disney was Miramax's parent company and oversaw the subsidiary's hiring, film budgets, marketing, and finances.

---

[1] Peter Biskind, *Down and Dirty Pictures: Miramax, Sundance, and The Rise of Independent Film*, Simon & Schuster (2004).
[2] *Id.*
[3] Dave McNary, *Disney Agrees to Buy Miramax,* UPI (Apr. 30, 1993).

20. Disney blocked the release of films like *You So Crazy*, *Dogma*, and *Fahrenheit 9/11*, forcing Defendant Weinstein and Miramax to sell the films to other studios.

21. In 2004, CEO Michael Eisner exercised his control over Miramax by auditing its financial books.[4]

## JURISDICTION

22. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 insofar as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

23. Plaintiff is a citizen of the State of Georgia.

24. Defendant Weinstein is a citizen of the State of Connecticut.

25. Defendant Miramax is a citizen of the State of New York.

26. Defendants Disney is a citizen of the State(s) of New York and/or California.

27. Venue is proper in the Southern District of New York because a substantial part of the events giving rise to the claim, including but not limited to, Defendant Weinstein's assault of Plaintiff, occurred in this District.

## FACTUAL ALLEGATIONS

### Plaintiff Begins Her Modeling Career

28. Plaintiff is a successful model whose career has spanned the fashion, film and television industries.

29. Plaintiff has worked on domestic and international modeling campaigns for household fashion brands.

### Plaintiff Is Invited By A Modeling Agency To Meet Weinstein

30. In Summer 2003, Plaintiff was looking to expand her career beyond modeling and spoke

---

[4] Sharon Waxman & Laura M. Holson, *The Split Between Disney and Miramax Gets A Little Wider*, N.Y. TIMES (Jun. 7, 2004).

4

with bookers throughout New York City about film and television opportunities.

31. One afternoon, she received a call from a modeling company executive ("the Executive"), who asked her to meet him at his office to discuss a potential business opportunity.

32. At the office, the Executive told Plaintiff that he arranged a meeting between Harvey Weinstein and herself that evening at PM Lounge, a West Village lounge, located at 500 Gansevoort Street, New York, NY 10014.

33. The Executive boasted that meeting Weinstein would allow her to "make it big" and would accelerate her transition into film and television roles.

34. The Executive, then, told Plaintiff: "Don't fuck him until he puts you into a movie," before cackling.

35. Plaintiff did not know about Weinstein's predatory casting practices, nor had she heard any rumors about such behavior.

36. Although Plaintiff was bothered by the Executive's crass comment, she chalked his comment up to misogyny and was thrilled by the possibility of working with the biggest producer in Hollywood.

37. Furthermore, Plaintiff had been introduced to the Executive by a mutual friend, thus, she trusted that the meeting with Weinstein was a genuine offer.

38. Plaintiff was also familiar with PM Lounge, as she was friendly with a club promoter who had invited her to the lounge on several occasions.

39. Later, Plaintiff realized that the Executive had arranged her meeting with Weinstein to facilitate his sexual assault of her.

**Plaintiff Brings Her Roommate To Her Meeting With Weinstein**

40. During this period, Plaintiff was living with her roommate Jane Doe ("Jane") at an

apartment in the Chelsea neighborhood.

41. Plaintiff and Jane became close friends after meeting at a modeling gig in Miami, Florida.

42. Over the course of several years, the women frequently saw each other at catalog shoots, commercials, and editorials before deciding to live in New York together in 2003.

43. Jane's friendship with Plaintiff was well-known in the modeling industry, as they were inseparable.

44. That day, Plaintiff excitedly told Jane that she was going to meet Weinstein at PM Lounge and asked if she wanted to attend as well.

45. Plaintiff told Jane that she would introduce her to Weinstein, and that perhaps he would consider her as well for an acting role.

46. Jane agreed to accompany Plaintiff to PM Lounge.

47. That evening, the women got ready before heading to PM Lounge.

48. As Weinstein had not yet arrived at the PM Lounge, the women danced with each other and spoke with the club promoter about Plaintiff's meeting with Weinstein.

49. When Weinstein arrived at the club, the club promoter ushered them to his table.

50. During Weinstein's conversation with Plaintiff and Jane, he repeatedly told them that he wanted to get to know both of them better, so he could see their "real selves" to ascertain their acting potential.

51. At a certain point, Weinstein told the women that he was having difficulty hearing them, as the Lounge was too loud and crowded.

52. Weinstein asked Plaintiff and Jane if they would go to his place to discuss potential acting roles.

53. Plaintiff and Jane agreed and left the Lounge with Weinstein.

54. Weinstein's chauffeur drove the group to his hotel room at the Ritz Carlton Battery Park, located at 2 West Street, New York, NY 10004.

55. Plaintiff was very excited to speak with Weinstein and hoped that his promises of procuring her an acting role would come to fruition.

**Weinstein Sexually Assaults Plaintiff And Her Friend**

56. At the hotel room, Weinstein plied the women with alcohol ordering them bottles of Boulevardier and Dom Perignon, several gimlets for Plaintiff, and vodka cocktails for Jane.

57. As Plaintiff sat on the couch, Weinstein grabbed Plaintiff's breasts and tore at her tank top.

58. In Plaintiff's efforts to avoid being groped, drinks were sloshed onto her shirt.

59. Plaintiff fled to the bathroom, and Jane followed suit.

60. Weinstein barged into the bathroom and continued to leer at Plaintiff's visible breasts through her soaked tank top.

61. Weinstein demanded that the women strip and take a bath with him.

62. Without waiting for an answer, Weinstein exposed himself to the women before entering the tub.

63. Weinstein, again, commanded the women to join him in the tub.

64. Plaintiff and Jane complied with his request, as she they felt backed into a corner and feared that he would retaliate against them if they refused his sexual advances.

65. Plaintiff had also consumed several alcoholic beverages throughout the night and felt as if she was stuck in a daze.

66. In the tub, Weinstein directed the women to engage in same-sex sexual conduct with each other.

67. Plaintiff felt disgusted but was too frightened to voice her opposition.

68. Weinstein grotesquely watched, taking perverse joy from forcing the women to engage in sexual acts with each other.

69. As Weinstein directed the women's forced sexual activity, Plaintiff dissociated and felt as if she was having an out-of-body experience.

70. At some point, Weinstein dragged the intoxicated women out of the tub and into the bedroom.

71. Weinstein, then, pushed Plaintiff onto the bed, and raped her.

72. The weight of Weinstein's body on hers made Plaintiff feel like she was suffocating.

73. Weinstein also forced Plaintiff to perform oral sex on him.

74. Weinstein also directed Plaintiff to engage in further sexual acts with Jane.

75. After Weinstein ceased assaulting Plaintiff, he forcibly penetrated Jane as well.

76. Once Weinstein was sexually gratified, he abruptly left the hotel room.

77. Plaintiff was left feeling violated and humiliated by Weinstein's assault.

78. Shortly thereafter, the phone in the hotel room rang.

79. The sudden ring of the phone worsened Plaintiff's already shaken state.

80. The caller identified herself as Weinstein's assistant and asked Plaintiff what she was doing in Weinstein's hotel room.

81. Plaintiff felt disorientated and angry, as she explained how Weinstein had lured the women to his hotel room and assaulted them.

82. Plaintiff's heart raced and she felt as if her life was falling apart in front of her.

83. The assistant sounded unsurprised by Plaintiff's complaints and was more annoyed with Plaintiff for inconveniencing her.

84. Instead of addressing Plaintiff's serious complaints of sexual assault and battery, the

assistant had a combative tone and demanded that the women leave the hotel room immediately.

85. Plaintiff told the assistant they could not leave the hotel room as their clothes had been soaked, as they had been deposited on the wet floor when Weinstein forced them into the tub.

86. The assistant sent up two pink Juicy Couture tracksuits for the women to wear.

87. The women went back to their apartment.

88. Afterwards, Plaintiff became highly emotional and angry as she recounted Weinstein's assaults to Jane.

89. Jane was unresponsive, overcome with shock at what Weinstein had done to them.

90. For the next several weeks, Plaintiff experienced depression, anxiety, anger, self-blame, suicidal ideation, body image issues, and demoralization.

91. Plaintiff experienced difficulty sleeping, as she experienced resurgent memories of Weinstein assaulting her and they invaded her thoughts.

92. Plaintiff also experienced a loss of appetite, as she was overwhelmed that she had been sexualized and treated as an object, rather than as someone with talent and goals.

93. Plaintiff also experienced a loss of trust in people and authority, as she worried that others would seek to take advantage of her like Weinstein did.

94. Plaintiff repeatedly tried to discuss the assault with Jane, however, each time, she shut down Plaintiff telling her it was too painful to discuss.

95. Plaintiff blamed herself for putting herself and Jane in harm's way.

**Plaintiff Suffers Emotional Distress Following The Assault**

96. Plaintiff soon decided that she could not remain in New York, as she constantly

experienced triggers that resurged memories of the assault.

97. However, Plaintiff understood that the Executive had invited her to the PM Nightclub, knowing Weinstein's propensity to sexually assault women.

98. Other triggers painfully brought back memories of Weinstein's assault.

99. Plaintiff fled to Germany in an effort to escape reminders of the assault.

100. However, despite the physical distance between New York and Germany, Plaintiff continued to experience depression, resurgent memories, and self-blame for the assaults.

101. In 2004, Plaintiff attempted suicide and was hospitalized.

102. Plaintiff also experienced alcohol and drug addiction, as she attempted to cope with the emotional trauma of being assaulted.

103. Plaintiff has also experienced intimacy issues, as she struggles to maintain emotional and sexual relationships with men.

104. Weinstein's assault has altered the trajectory of Plaintiff's career, denying her a successful and lucrative career in the modeling and film industries.

105. To this day, Plaintiff experiences severe bouts of depression, anxiety, body image issues, feelings of worthlessness, and intimacy issues because of Weinstein' assault.

106. Plaintiff seeks justice for herself and for any of other Weinstein' victims.

## CAUSE OF ACTION

### AS A FIRST CAUSE OF ACTION
### THE NYC VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION ACT
### (Against Defendants)

107. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

108. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

109. The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

110. The above-described conduct of Defendant Weinstein, including sexually assaulting or abusing Plaintiff at a music studio located in Manhattan. constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in N.Y. C. Admin Code § 10-1103.

111. Defendant Weinstein's crimes of violence were motivated by Plaintiff's gender as defined in in the New York City Administrative Code § 8-903, as Defendant committed forcible sex acts upon Plaintiff that would constitute felonies under state law and as the conduct presents a serious risk of physical injury, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

112. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

113. The above-described conduct of Defendant Weinstein constitutes sexual offenses as defined in Article 130 of the New York Penal Law.

114. Plaintiff is a woman, who is older than 18, who alleges misdemeanor and/or felony penal law violations, including but not limited to sexual misconduct (N.Y. Penal L. § 130.20), criminal sexual act in the first degree (N.Y. Penal L. § 130.50), criminal sexual act in the third degree ( N.Y. Penal L. § 130.40), forcible touching (N.Y. Penal L. § 130.52), sexual

abuse in the first degree (N.Y. Penal L. § 130.65), and sexual abuse in the second degree ((N.Y. Penal L. § 130.60).

115. Defendant Weinstein coerced Plaintiff to engage in sexual contact and/or sexual intercourse, despite the fact that he was rendered incapable of consenting due to intoxication.

116. Defendant Weinstein gave Plaintiff several drinks throughout the night, thus, he knew or should have known that Plaintiff was incapable of consenting to sexual contact and/or sexual conduct.

117. Defendant's actions presented a serious risk of physical injury to Plaintiff's person, regardless of whether or not those acts resulted in criminal charges, prosecution or conviction.

118. As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling him to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

119. Furthermore, Defendants Disney, Miramax, and DOE 1-10 enabled Defendant Weinstein' commission of the crimes of violence motivated by gender, and thus, are liable under the NYC Victims of Gender-Motivated Protection Act.

120. Defendants Disney, Miramax, and DOE 1-10 enabled or participated in the sexual abuse of Plaintiff because Defendants failed to, among other things, protect Plaintiff from a known danger; have sufficient policies and procedures in place to prevent sexual assault;

properly implement policies and procedures to prevent sexual assault; take reasonable measures to ensure that policies to prevent sexual assault were working; train their employees on identifying sexual assault and inappropriate workplace behaviors; protect their employees from sexual assault; and adhere to the applicable standard of care.

121. Prior to Weinstein sexually assaulting Plaintiff, Defendants Disney, Miramax, and DOE 1-10 knew or should have known that Weinstein was not fit to be in a position of authority. Defendants, and through their agents, servants and/or employees became aware, or should have become aware of Weinstein's propensity to commit sexual assault and of the risk to Plaintiff's safety. At the very least, Defendants knew or should have known that they did not have sufficient information about whether or not it was safe to employ Weinstein in a position of power.

122. Defendants Disney, Miramax, and DOE 1-10 . failed to properly survive Weinstein and protect Plaintiff from a known danger and thereby enabled Weinstein's sexual assaults of Plaintiff.

123. As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

## JURY DEMAND

124. Plaintiff demands a trial by jury of all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendant Weinstein engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that Weinstein sexually assaulted Plaintiff;

B. Declaring that Defendants Disney, Miramax, and DOE 1-10 engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that they enabled Defendant Weinstein's commission of the crimes of violence motivated by gender;

C. Awarding Plaintiff compensatory damages for mental, and emotional injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff damages for Defendants' breach of contract;

E. Awarding Plaintiff punitive damages;

F. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful practices.

Dated: New York, New York
June 3, 2025

                **PHILLIPS & ASSOCIATES,**
                **Attorneys at Law, PLLC**

By: _____
Michelle A. Caiola, Esq.
Jonathan Goldhirsch, Esq.
*Attorneys for Plaintiff*
45 Broadway, 28th Floor
New York, New York 10006
T: (212) 248-7431
F: (212) 901 - 2107
mcaiola@tpglaws.com

jgoldhirsch@tpglaws.com